All right, Counsel, you may proceed. Good morning. May it please the Court. Jonathan Ellis on behalf of LPL Financial. FINRA Rule 13804 creates a narrow exception to the otherwise mandatory arbitration regime for disputes like this one between FINRA members. This proceeding began in July of 2004 when Ameriprise invoked that exception in a purported effort to maintain the status quo until an arbitration panel could be convened to hear its assertions of trade secrets misappropriation against LPL. The District Court immediately, and we think rightly, recognized that no such injunction was warranted, most obviously because the alleged misappropriation occurred when some 30 advisors had transferred their business from Ameriprise to LPL between 2018 and 2021, between four and seven years ago. As the District Court put it, the ship has already sailed, and there is no basis for concluding that any imminent harm to Ameriprise's trade secrets is likely. Nevertheless, one year later, the District Court entered an order, the one on appeal here, that purports to be based on a narrow compromise that the parties reached to address unrelated and, in our view, unfounded concerns by the District Court about data privacy for Ameriprise's mostly former customers. The July 18th order is invalid and should be vacated for several independent reasons. First, it exceeds the Court's authority under Article 3 and Rule 13804. It intrudes into the merits and discovery of a pending arbitration that has been pending for a year and has a panel been assigned for months. It was entered without providing LPL an opportunity to be heard or respond to Ameriprise's arguments about the scope of the stipulated order, and it well exceeds the narrow compromise that the parties reached in the stipulated order. Now, although Ameriprise claims in this court that all this is necessary to protect its trade secrets and its former customers' privacy, it hasn't been coy elsewhere about what really is going on. Ameriprise has told the arbitrators more than once that the value of the July 18th order to it is the discovery that it affords it outside of the arbitration process. Indeed, it has described that information as critical to its claims in arbitration. But the district courts have no authority under Rule 13804 to superintend discovery in pending FINRA arbitrations, no authority to issue partial but seemingly permanent merits relief outside of the arbitration proceeding, no authority to issue injunctions to enforce privacy rights of third parties not before the court who are perfectly capable of asserting those rights themselves, and no authority to enter expansive injunctive relief months after a FINRA arbitration has begun. So let me jump into the question here. Oh, go ahead, Judge Clifton. It's probably the same kind of question. Has the arbitration panel been asked to or spoken to the question of discovery? The arbitration panel is managing discovery as we speak. The last day to issue discovery requests is actually today, and they will resolve any disputes the parties have about that discovery. Our point is only that that discovery should be overseen and controlled by the arbitration panel, not by the district court. In your view, is there any role from the court at this point now that the panel is formed and proceeding? So we think that the way that Rule 13804 injunctions are supposed to work is just to manage that process, the interim period between when a court party comes to the court, asks for an injunction to maintain the status quo until that arbitration panel could be seated. That has now happened, and we think that the role of the district court has fallen away. Now, I want to be clear. LPL agreed to the stipulated order and did not appeal the stipulated order. We're not asking for this court to relieve us of our obligations under the stipulated order or even to vacate that injunction. Our point is only that the court can no longer come in and interpret that order in a way that is different than the parties meant to the agreement that the parties entered into, and then intrude into the pending arbitration, both in the merits and the discovery that's being overseen by the panel. And when you're referring, just to keep things straight here, the stipulated order was the one in 24, not the July 18, 2025. That's correct. The stipulated order is at ER 185 of our excerpts of record. The first one. The first one. And the one, get it to me by 3 p.m., that one. That's the one. Okay. That's the one. So here's my question, is that we have the advisors in this case, and the advisors are saying they should have been in this case at least as of that hearing in July. Hypothetically, if we agree with them and we say, you know what, you should have been allowed to intervene then because your phones are the ones being imaged or computers or whatever it is, what happens in this case? I take it we would, if that was where we would decide, we would then vacate the July, that would be a separate reason to vacate the July 18 order. That is an independent reason to vacate the July 18 order that the advisors have advanced. I would urge the court to reach our arguments about the July 18 order. In particular, at least I'd ask the court to reach the arguments about the scope of the July 18 order. We do think that there is a fundamental disagreement between the parties about what that meant, and we think that we've been fully briefed here in a way that it didn't get to be fully briefed below, and we don't think there's really any doubt that the stipulated order was limited to the bulk OPLA tool. If I could take a minute to kind of walk the court why that matters. So we agreed in the December 12 order to a search, to a deletion, and to the production of the bulk OPLA tool. We did that because although we thought the court's concerns were unwarranted and injunctions shouldn't issue, we thought they were real, and we didn't have much concern about that. The bulk OPLA tool is a transfer tool that we provided to advisors in order to move their business from Ameriprise to LPL. Those transfers occurred between 2018 and 2021. The value of that tool going forward to the advisors is very minimal, and therefore to LPL and its customers. We were comfortable agreeing with that. The July 18 order, the one that's on appeal here, doesn't say anything about the bulk OPLA tool. Instead, it requires the search for the production and the deletion of any information that is related to or associated with former Ameriprise customers, including those customers who are now LPL customers. That's a big difference in scope and one that's going to make a difference to the way that our advisors provide advice to their current clients and, therefore, to our customers. If you can think about the way that this works, right, advice is given to a client about all sorts of things, and there can be documents, historical documents, that preexisted the move from the advisors' move from Ameriprise to LPL that are still relevant to the advice that they are providing, and the record shows that some of that information is only available on their devices and is not on the LPL servers and, indeed, not even in the client's possession, and they need that information. That's the crux of our dispute and our objection to the July 18 order. That is not what we inert to, and that imposes burdens that we cannot accept. Now, my friend points to a couple of different things in the stipulated order that he says it should be limited. It was never limited to the bulk upload tool. I don't take him to object to our reading of the July 18 order, but he says the stipulated order has always meant more than the bulk upload tool. Principally, he points to Paragraph 4 of that order. That is the one that is really the crux of the dispute here, the one that requires the search, production, and deletion of information, and he says that document, that paragraph, only refers to customer information and non-customer information. It doesn't mention the bulk upload tool, and that's true, but that's because the customer information and non-customer information are defined terms in the stipulated order. If you look at the first paragraph of the stipulated order, it says that customer information is certain financial customer information, one bucket of information about which two things are true. The first is that it was retained by the advisors when they moved from Ameriprise to LPL, and second, it was transferred via the bulk upload tool. Then if you look at a couple paragraphs later, it defines what non-customer information is, and that is, again, information transferred via the bulk upload tool from individuals who never became LPL customers. So when you look at paragraph four and you see that it refers to any customer information or non-customer information, that is information limited to the bulk upload tool. That's how the district court understood this order. Even at the beginning of the July 17th hearing, there's an exchange, which makes it pretty clear that the district court read that stipulation to refer only to the bulk upload tool. You look at, this is on our ER again, second volume, page 41, lines 23 to 25. The district court makes clear that she's asking only about the bulk upload tool. When LPL's counsel, my colleague, tried to address information beyond it, she redirected and said, no, we're talking about just the bulk upload tool. Is that available on the LPL server? We confirmed that it is, and then turned to the advisors and said, I therefore reject your ground for intervention that says that this order is going to impede on your ability to do your job because you can get to all of the information that will be deleted pursuant to the stipulation on LPL servers. We think that the district court was correct in reading it that way and then erred when it expanded it later on in the hearing where we were not able to provide the arguments that we would have provided and have provided to this court. Let me ask you one more question before you sit down. So in that July 2025 order, there are also paragraphs 9 and 10, which don't really affect Ameriprise directly. It's more of an LPL question, but I wanted to get your take because you've thought a lot about this case. You've been on this case for a while. I'm not familiar with a practice where a court can sanction someone who's not a party to the litigation or the court can order to do something that's not a part of the litigation. But again, are you aware of any authority that allows that to happen? I'm aware of no authority to that, Your Honor, and I haven't seen Ameriprise point to any authority for that position. Okay. Thank you. Yes. Let me ask one more question. I regret using your time, but we do have flexibility today. Could you tell me what order you would want or what decision you would want from this court? The case will remain alive because we stay rather than dismiss, but what is it you would seek from us? We're looking for an order that vacates the July 18th order. We provide several grounds to that effect. And then beyond that, we would like some guidance from the court about the meaning of the stipulated order. We have been trying to comply with our obligations under the stipulated order since it was entered, and we have not been able to accomplish that because there is such a disagreement between the parties about whether that stipulated order is limited to the bulk upload tool. I think if the court were to interpret that order and resolve that question, it would be very helpful as we go back down, and we try to fulfill our obligations under the stipulated order. Should it be for this court or the district court to interpret that order, or is that something that's passed to the arbitration panel? So I'm comfortable with this court interpreting that order. The district court, of course, hasn't interpreted that order insofar as if it's limited to the bulk upload tool, as we did. Again, we didn't appeal that order. We're not trying to get out from the obligations of that order. I think that the advisors might have a different view on that particular question, but as I say, we are comfortable complying with the stipulated order as limited to the bulk upload tool. I want to ask you one quick thing as well. I'm sorry, Judge Clifton, did I cut you off? I was about to say thank you. Oh, okay. Thank you, and have at it. Thank you. Thank you. Can you talk to me a little bit about your motion to seal? I guess it's not before this court, Your Honor. I guess I don't have. I thought there was, and I apologize if I have this confused, that there was issues with reputational harm. That's the advisor. Oh, the advisor. I'm sorry. Thank you. Well, I guess you can ask that question to them. Yeah, that will be my next one. Thank you. All right. Thank you very much, counsel. We'll go ahead and give you the view. I think you requested three minutes rebuttal. Yes, Your Honor. We'll give that to you. Thank you. Good morning, Your Honors. George Freeman. May it please the Court on behalf of the advisors. No one should be forced to surrender his or her rights without notice, without consent, and without a say. Yet that's exactly what happened to the advisors here. The district court ordered them to submit to an invasive and improper forensic review. It was negotiated without their knowledge or input. Then when the advisors asked to intervene to protect their rights and to move the matter to arbitration where it belongs, the district court said no, depriving them of their rights under the Federal Arbitration Act. We're asking that this court reverse the denial of the motion to intervene and remand with instructions to stay the proceedings pending arbitration. And I'll start with the motion to intervene. In denying that motion, the district court made two critical errors. It erroneously concluded the motion was untimely, and it erroneously concluded that the stipulated order doesn't impair the advisors' interests. Both errors require reversal. First, timeliness. The most important consideration regarding timeliness is prejudice. The district court considered prejudice, but it applied the wrong test. For starters, the district court focused on the future. The prejudice test focused on the past. It's retrospective, not prospective. The district court says it was seeking to prevent the unauthorized disclosure of confidential customer information. The district court concluded there was a, quote-unquote, time-urgent need to protect that information, and that the advisors had been acting too slowly to protect it. This was clear error. The advisors had protected this information without fail ever since they had left Ameriprise, two to six years before Ameriprise filed suit. The record contains not a single, no evidence of a single data breach during that period. And even after Ameriprise sent out a data breach notice seven months ago, not a single customer has complained. The other flaw in the district court's prejudice analysis is it mistakenly focuses on potential harm to third parties, harm they might suffer. The relevant prejudice is the actual harm, if any, the plaintiff suffered from the delay in filing the motion to intervene. Here, no one has, no one can, identify any prejudice that Ameriprise suffered as a result of the advisors filing their motion in May of 2025 instead of earlier, because none exists. Unable to identify any prejudice, Ameriprise argues this course effectively abandoned the prejudice test in the Chevron case and replaced it with a bright-line test for timeliness of five months and goes on to say that the advisors simply missed the deadline. But that's not what Chevron says. The putative intervener there, an insurer, knew from the outset that the defendant could not protect its interests. Even so, it took no action. Only after the plaintiff had obtained an $18 million default judgment did the insurer take any action. Vacating the default judgment, however, would have prejudiced the plaintiff. The determining factor in Chevron was prejudice, not the mere passage of time. Just a few months ago more, this court in the Chatelaine v. C.S. Pharmacy case reaffirmed that prejudice is the most important consideration in determining timeliness. Given the absence of prejudice here, the district court's finding of untimeliness is an abuse of discretion. Next, protectable interests. The district court found the forensic examination would not impair any of the advisor's protectable interests. We've identified four. Let me just ask you to focus here on one of those, the right to arbitrate. The advisors have a right to arbitrate the propriety, nature, and scope of any forensic review. The stipulated order, the July 18 order, and the denial of the motion to intervene deprive them of this right, a right the Supreme Court has repeatedly insisted is a product of the important, the strong federal policy favoring arbitration. No basis exists for ignoring this policy or for failing to find that the advisor's right to arbitrate is a protectable interest. Because the district court erred in finding untimeliness and no protectable interests, this court should reverse the denial of the intervention, especially given this court's mandate that Rule 24, the federal rules of civil procedure, should be applied liberally in favor of intervention. And the panel should do one more thing. The Supreme Court has been emphatic. Matters that are subject to binding arbitration should be moved, quote, out of litigation and into arbitration as quickly and easily as possible. The only way to do that here is to reverse and remand with instructions to stay the proceedings in their entirety pending arbitration. While appellate courts ordinarily don't address and resolve issues on appeal that haven't been addressed and resolved below, there is a well-established exception to this rule, and that exception applies here. The exception is for cases where the issues to be resolved on remand are purely legal. And the exception is particularly appropriate in those cases where, as here, the issues to be resolved on remand can be decided with a straightforward application of controlling precedent. Here, there are only two issues the district court need consider. Indeed, only two issues the district court may consider on remand. Whether the advisers in Ameriprise have a valid agreement to arbitrate and whether that agreement applies to Ameriprise's demand for a forensic review. The answer to both is yes. And that's even without applying the strict rule the Supreme Court first adopted in 1983 in the Moses H. Cohn case, the rule that all ambiguities be resolved in favor of arbitrability. Applying the Moses H. Cohn... Excuse me for a second. Surely, Judge. Let me follow up with the question that I posed earlier because I want to be clear I understand. There appears to be a distinction between the position taken by you and LPL. You want to speak and have reason to speak to the denial of the motion to intervene, not so much for them. The second part and what I want to focus on is when asked what path we should follow, what order LPL sought, counsel was prepared to leave the stipulated order in place asking us to interpret it in a certain fashion. Do I understand correctly that you're basically saying we shouldn't venture down that path? We should instruct the district court to stay everything and defer to the arbitration panel for questions such as that. Yes, Your Honor. We believe that the law requires the panel to go further. We believe that once this court considers the issue, which it will invariably consider in ruling on the motion to intervene under the harmless error doctrine, you're going to look at is the ruling harmless and you're going to conclude no, it's not because there are two questions to be asked. One, is there a valid arbitration agreement that exists and does it apply to Ameripas' demand for the forensic exam? And you're going to see that once you answer those questions, yes, there's nothing left to be done. And the reason why for that, Your Honor, is because Section 3 of the Federal Arbitration Act says those are the two questions a district court must ask. Once it concludes the answer is yes, it has no discretion. It's mandated to refer the proceedings to arbitration. So that's the case here, Your Honor. You're going to be answering those two questions. We would ask you to do it under the exception to the no review rule and simply under the harmless error doctrine. So when you look at it from either perspective, the answer to the two questions is the same, and the answer given Section 3 of the Federal Arbitration Act is remand with instructions to stay the entire proceedings. And I'm going to elaborate a little further on that, Your Honor. The Supreme Court, in talking about the discretion under Section 3, has said that the district court is, quote, unquote, impervious to discretion, or that the Section 3 mandate is impervious to discretion. You must stay the entire proceedings. And there's another reason for the panel to reach the same conclusion, and that's because when properly classified, the stipulated order and the July 18 order are mandatory injunctions that violate Rule 1308. These injunctions are particularly disfavored in general and specifically in this context. Under Federal Rule 13804 and the court's equitable discretion, in this context, courts may only issue prohibitory injunctions, injunctions designed to preserve the status quo pending arbitration. And that's what the district court was authorized to do here, either under 13804 or under the equitable discretion rule. It wasn't permitted to go further. You may only issue a mandatory injunction when there is a, quote, unquote, urgent need to prevent extreme danger. We have shown that there was no danger at all under these circumstances, much less extreme danger. So there was no basis for the district court to issue a mandatory injunction to begin with. There certainly is no basis for continuing that mandatory injunction going forward. Given that the arbitration panel was selected and has been actively involved in this case since earlier this year. Significantly, the arbitration panel has set a discovery to schedule. As Mr. Ellis noted, I think that schedule ends today in terms of propounding additional discovery. It's ruled on multiple discovery motions. It's actually scheduled motions to dismiss in the case, and it's set the hearing on the merits to begin next fall. So the arbitration panel is in a position now to do everything the court would otherwise be in a position to do. And 13804 says the court's merely to step in to provide interim relief until the arbitration panel is in a position to act properly. So there's nothing left for the district court to do. There's nothing left that the district court needs to do. In light of those two things, in light of Section 3 of the Federal Arbitration Act, the law really mandates that the panel reverse and remain with instructions to stay the entire proceedings. One question for you, because we are a little over time. The same question I had for previous counsel. Paragraphs 9 and 10 of that July 2025 order that says that they could sanction your clients if they don't turn over their phones, for example. Are you aware of any case law that would permit a district court judge to sanction someone who's not a party to the litigation? We're not aware of any, Your Honor. Okay. And if I may add one point to that. We reached that conclusion early on, too, that the court had no authority to do that. And that's an additional reason why we would say that the stipulated order, going back to December, is a mandatory injunction, at least as to us, because what the district court did in July is indicative of, I think, the district court's view of the authority it had over us with respect to the stipulated order. So it would be a mandatory injunction as to us as well. Thank you, Your Honor. All right. We'll go ahead and give the same thing. We'll give them three. Thank you. Okay. Great. Thank you, Your Honors. Good morning. I'm Dan Lawton, appearing on behalf of the Appellee, Ameriprise Financial Services, LLC. I'd like to address four points this morning. The first is the fatal procedural flaw in LPL's appeal that deprives this court of jurisdiction to hear the appeal. The second is the correctness of Judge Oda's enforcement order of July of this year when juxtaposed with FINRA Rule 13-804. The third is the untimeliness, the true untimeliness of the advisor's intervention motion, which Judge Oda correctly denied. And the last is the practical effect of the vacator and reversal that the appellants request of this court. We start with the main fact of these appeals, which is the lack of an appeal from an appealable order on the part of LPL. And this is something really that I think is the elephant in LPL's room. The court knows by heart, I'm sure, could recite what Section 1292 says, the jurisdiction it provides to this court for review of interlocutory decrees. When it comes to injunctions, orders granting, continuing, dissolving, or modifying injunctions are, of course, appealable. So do we have an order of that nature before this court in LPL's appeal? And the answer is no. The July order does not grant, dissolve, or modify an injunction. It interprets, and that word is important here, and I use it purposely because that's the word Judge Oda used to describe what she was doing. She said, this is the court's interpretation of the stipulated order, the consent decree of December of 2024. District courts have the power, and they should, they must have the power to interpret and enforce their own injunctions when people don't comply with them. You just called it an injunction. So why isn't this within the category of injunction? I didn't hear the first part, Your Honor. I'm sorry. Can you repeat? You just used the word injunction to describe this. That seems to fit the statutory requirement to give us jurisdiction. Your Honor, I'm afraid I wasn't quite clear. When I used the word injunction, the antecedent, or what I was referring to, was the consent decree of December 2024. That was an injunction. And in this case, the district court decided to interpret because the parties plainly had very different understandings of what was sort of a strong arm but stipulated order. So she comes in and says, this is what it's going to mean. That sure looks to me like an order, you can call it interpreting, but modifying or clarifying or specifying the terms of an injunction. And I don't understand why that doesn't become an appealable order. Because, Your Honor, of the language of Section 1292, which doesn't use the word interpreting. Congress chose the words it chose and put them in that statute, and interpreting is not one of those words. And this really brings us... Why isn't it modifying? Because it certainly modifies the understanding that LPL professed that it had. It was a very contested decision made on July 8. It's not like the parties were on the same page. So why isn't it modifying the understanding of the parties to say, in the court's words, this is what this means? Because it really doesn't add anything substantive to the consent decree of December 2024. It interprets it and it sets deadlines. And the only reason it does that is because recalcitrant parties, and I think that's a fair term to describe the appellants in their conduct below in the district court, could not bring themselves to comply with what they themselves had agreed to. And I said the elephant in the room earlier, and Your Honor raises the use of the term injunction. LPL fought very hard to avoid using that word when it came to the consent decree. If it quacks like a duck, why don't we take it as a duck? Exactly. And this is where that duck leads us. If the consent decree is an injunction, and it most certainly is, because it quacks like a duck and walks like a duck, then there was a period of 30 days within which LPL had to appeal from that injunction. And they, for reasons known to themselves, I don't know them, they did not do that. Now, it's not important to this court why they didn't avail themselves of the right to appeal within that 30-day period after December of 2024. What's important is that they did not avail themselves of that opportunity. And this court has seen consent decrees before, and there's plenty of them in the federal reports. Counsel, can you spell out for me, please? I'm a little confused at your interpretation. What did Judge Oda specifically change or reinterpret in her order that was interpreting the stipulated order? She set deadlines, and the consent decree or the stipulated order, I think those terms are interchangeable, didn't set hard deadlines. She set hard deadlines in the enforcement order, the July 2025 order. And what would happen if you didn't meet those hard deadlines? If you didn't meet those hard deadlines, you would be in contempt of the district court, and Judge Oda could impose sanctions, as Judge Owens pointed out. Okay. And was it also directed as to LPL? LPL was also potentially going to be on the hook for sanctions if they didn't meet those hard deadlines? Yes. So where does all of this leave us? Where all of this leaves us is whether you call it equitable estoppel, whether you call it a failure to appeal from an injunction, that December 2024 order, whether you call it an appeal from a non-appealable order, the July 2025 order, the LPL appeal is DOA in this court. Let me ask you about the question that Judge Owens has raised with regard to the proposed interveners who did not have an opportunity, did not stipulate to that order, but are now subject, according to the terms of the July 8 order, to sanctions for failing to comply with an order that they weren't part of. Why isn't the inability of the investment advisors to participate in that process enough by itself to open the door to challenge here? Your Honor, the answer is twofold. The first part of the answer is Rule 65, which makes parties acting in concert with parties enjoined essentially bound by that injunction. These advisors, all of them, are parties that were and are acting in concert with LPL. And so according to Subdivision D-2 of Rule 65, they are bound by Judge Oda's order. What finding has been made that they were acting in concert? There is no specific finding. Isn't that a problem? I don't think so, Your Honor, and here's why. Because this record has plenty of material in it whereby this court could find that they were acting in concert. Okay, but the district court never made any finding under Rule 65, correct? She didn't make an express finding that they were acting in concert. That's right. However, it's clear that they were. Okay, I understand the next argument, but just to be clear in this record, I've read all the transcripts and I don't remember ever seeing a discussion of Rule 65 in a concert. That's a – you're absolutely correct, Your Honor. Okay, you're absolutely right. So let's assume that one doesn't work. You said you had another point. Yes, the second point, the second part of the twofold is in the excerpts of record starting at page 12. This is ER 12. What hearing are you referring to? Was it a pleading or a hearing? It's a pleading, Your Honor. It's part of the excerpts of record, and it is a memo dated March 14, 2025 sent by counsel for LPL and counsel for Ameriprise jointly to counsel for the individual respondents in the arbitration case. And those respondents at that time certainly included the advisers because they'd been added on New Year's Eve, December 31, 2024 as parties to the arbitration. And that memo puts the lie to this idea that the advisers didn't know what was going on. They're strangers to all of this. All of this is happening out of their eyeline and behind their backs. It's not true. This is language approved by counsel for LPL saying you've got nonpublic customer PII such as Social Security numbers and dates of birth. There's a stipulated order signed by the court. There's a forensic examiner. You've got to preserve all metadata. We've created a questionnaire for you. A certification is the formal title of that document. It's really a questionnaire. A copy of the certification must be completed. It goes on. And this is found at pages 12 and 13 of the excerpts of record. And then the certification with all the questions follows. Is it the SCR or the ER? This is the – Your excerpts of record. No, Your Honor. Because there are three parties here. So when you say excerpts of record, which one are we referring to? This is the appellant's excerpt of record. So not the appellant. So this is LPL's you're saying? Yes. Okay. And the low numbering, the two-digit number, shows that because they were the first to file excerpts of record. So it's a two-digit number. But this really illustrates the reality, and I think the court does, this court does take account of reality, that all of these advisors work for LPL. All of these advisors are bound by injunctions that are binding on LPL. As registrants, as registered representatives under FINRA rules, they're all bound to cooperate with LPL in investigations, in litigation. And they had counsel in March of 2025, and they were privy to all of this. So this notion that they didn't know what was going on, they're not really parties to this, I think is exploded by those two things, by Rule 65 and by that memo. Just so I understand how this would work, if I were an advisor and I had an old iPhone, an iPhone from 2020, and I gave it to my kid and wiped the phone and did whatever you're supposed to do, repurposed the phone to give it to my kid, and the kid has it now, but at one time it was used as a phone under the order, under the July 2025 order, they would have to turn over their kid's phone to the examiner? Well, there would be no physically turning over, Your Honor, because it all happens remotely. But I think theoretically, yes. Not theoretically. I think it would be within the terms, and then the forensic examiner would find there isn't any data on there, it was wiped, so there are no concerns there. But you'd have to do that. Right. So there is a concern if I know that my daughter's phone is going to be turned over to some third party. The Supreme Court has recognized phones are different. So I guess my question is that if we look at paragraphs 9 and 10 in the revised order, which would then, if an advisor said I'm not turning my daughter's phone over or the kid says I'm not turning my phone over, could the court then sanction the kid under the order who's not a party in this case? No, because paragraph 10 at line 15 says that those sanctions would be limited to what Judge Oda describes as individual financial advisors. So the child would be excluded. But the mom could be because the kid refuses to turn over the phone or refuses to – whatever you have to do to relinquish the phone. Right? And they've never had a chance to be heard on any of this. They would have a chance to be heard on it, Your Honor, under paragraph 9 because paragraph 9 reserves the right to make objections. But they're not a party to the litigation. That's why I'm just puzzled by this. They're not – you don't find them in the caption, but they have counsel. They received that memo that I identified earlier in the excerpts of record, and they knew what was going on. And they – Well, they received this memo, I understand, comes from you and from counsel for LPL, and it's addressed to counsel for individual respondents, which seems to recognize that they have a distinct interest. But A and B are busy talking for C. I'm not sure that's the same as saying C is committed to this. C is committed to this because they have chosen to work for LPL, and they are registered representatives that are bound by the – I've chosen to work for the U.S. Court of Appeals for the Ninth Circuit, but it doesn't bind me to everything it wants to bind me to. I understand that, Your Honor. But when an advisor – when these advisors went to LPL, they knew about the broker protocol. The broker protocol required them to limit whatever categories of data they took with them to five. And if they exceeded the five, then they weren't even allowed to take those five categories of data with them. When they got to LPL, they signed or were bound by LPL's Code of Conduct, which is part of the record. And LPL's Code of Conduct obliged them to not use or have on their personal devices any data that was deemed confidential by another securities firm. And that other securities firm is Ameriprise. So, yes, they weren't parties in the formal sense that both Your Honors are talking about. If you look at the caption, you won't find their names there at that time. But they were privy to these orders. They knew of these orders. They knew of the stipulated order on New Year's Eve of 2024, and they have not complied. And they stand here asking to continue to not comply with their duties. And what does that mean in the real world? That means there's data out there. We don't know what we don't know. Let's take a hypothetical involving a lawyer who switches firms. Lawyer goes to a new firm. I did that about six years ago. There's a spreadsheet. Tell us all your clients. We need to run conflicts checks, all of that. What's the financial information? How much money do they owe you? What are the hourly rates and so forth? I provided it. This happens every day. But where did I get all that data before I put it on that spreadsheet? I got it from my office desktop, my home desktop, my Mac, my iPhone. That's where all that data lives. So if I just turned over the spreadsheet to a forensic examiner and said, here you go, here's all the data, that wouldn't start to solve the problem because what I used to populate that spreadsheet is important. And if any of that data is unsecured out there in the world, we know what can happen, and we don't need to look very far to know what can happen in a worst-case scenario, like the Panama Papers. A bunch of financial data gets leaked by someone, and it winds up out in the world, and the people who are harmed by it really don't have any recourse. And that's a problem that Judge Oda was trying to solve. And I heard counsel, Mr. Freeman, say earlier that Rule 13804 only allows prohibitory injunctions, injunctions that would protect the status quo. And that's not exactly right, but I'm going to play along with my colleague, Mr. Freeman, for a moment. If the court reads Rule 13804, it won't find the word prohibitory and it won't find the word status quo in there. So, you know, there's nothing about Judge Oda's injunction that runs afoul of Rule 13804. But is this, you know, when we look at an injunction, and, Judge Clifton, you said quacks like a duck, you know, the first question I often have is, is it a mandatory injunction or is it a prohibitory injunction? It's mandatory, I guess, on a superficial level in the sense that you can say it tells people to do concrete things lest they be sanctioned. However, a prohibitory injunction aims at preserving the status quo. And what is the status quo? It's a status quo ante. And this court's decision in the Marlin Nutraceuticals case says the status quo is a status quo ante, the state of things as it existed before the bad event happened. In this case, that moment was before these advisors departed Ameriprise and went to LPL and took 187 categories of data of 4,500 customers with them. Judge Oda was trying to keep that horse in the barn or whatever term you want to use for that. This injunction, this consent decree in December, the sine qua non of the later order, the enforcement order of July, sought to solve that problem by containing, controlling and containing this data so that it wouldn't get out into the world at a significant cost to our client, Ameriprise. What customer is going to want to entrust their private financial data to a securities firm that can't keep it secure or that has advisors that are going to go rogue and go off the reservation and take this data out somewhere else? Counsel, let me ask you a little bit more about that. I know in your briefing you referred it as a fiduciary duty to protect the customer's information from a cybersecurity breach. What's the basis, nature and scope of that duty? Your Honor, Title 15, Section 6801 of the U.S. Code announces the policy of the Congress that financial institutions, and that definition applies here to both of these firms, has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' non-public personal information. So it's a statutory duty that comes straight out of the U.S. Code. Your Honor, I see my time is lapsing, and I'm sorry I've been too wordy, but let me close by saying this. This Court is not a forum for undoing consent decrees. And Judge Oda cared about preserving the confidentiality of Ameriprise's information. The FINRA arbitration in this case is more than a year away. FINRA doesn't have the power to stop the dissemination of personal identifying information. It doesn't have the power to issue injunctions. Only the district courts have that, and Judge Oda exercised that power. And this Court should do the same thing. So we ask that this Court dismiss LPL's appeal, affirm Judge Oda's order. Denying the intervention is untimely. And in the alternative, if the Court should not dismiss LPL's appeal, we ask that the Court affirm Judge Oda's July order. Thank you very much, Your Honor. Thank you, Counsel. Thank you, Your Honor. Just a few points in rebuttal. First, Judge de Alba, I apologize. It was a bit of a flurry, but we did file a motion to seal along with our motion to stay, and it just escaped my mind. You signed the declaration, right, Counsel? Yes, indeed. Your Honor, yes. It was truly a flurry. I don't have many like that. That's why I do appeals. But it concerns the names of the advisors who have not intervened here. They've been kept under seal in the Court below, and we were trying to keep it under seal here because they have not come to the Court to request relief, and the arbitration itself is generally treated as confidential. Okay. And I just wanted to ask about that because, you know, generally we like to keep things public. We like people to know what we're doing so that we're not feeling like we're hiding the ball. Why is there – I'm not sure that I agree with you that they have a – reputational harm is enough for us to say, okay, we'll keep it under seal. So I think the harm is that the allegations in this case are that they are treating this information in a way that is inappropriate, that is in violation of our security protocols, of Regulation SP, and the obligations that are imposed on them. We don't think there's any basis in the record for those allegations, and we're seeking to protect their confidentiality, keep their name out from, you know, sort of dragged to the mud and, you know, upset the ongoing relationship. But isn't that true in pretty much any case? You have – especially, like, as an example, a criminal case, someone's being alleged to be, I don't know, a sex offender. Sure. You know, their name gets dragged through the mud, but that's not filed under seal. That's, you know. Understood, Your Honor. I think the way this is set up, FINRA arbitrations are treated as confidential. That's a judgment that was made by Congress and by FINRA. And in these circumstances, we didn't see any reason why that should be different in this court. I take your point, Your Honor. I just think it's the context here, the confidential arbitration, the point of that confidentiality that we think warrants keeping under seal here. Okay. Thank you. Second, Your Honor, I wanted to speak briefly about my friend's point on the injunction. I do think that the July 18th order is itself an injunction. You can think about it as an initial injunction. You can think about it as a modification of the stipulated order, which I understand he agrees is an injunction. At bottom, we think the real question is, as this court said in Montana Wildlife, does it prescribe, conduct, and compel compliance? It clearly does. And even if you think that you need to find a distinction, of course, we've talked about the substantive difference between those two orders. That's our principal concern here. But it also adds deadlines, adds dates. There's no question about that. It also adds additional individuals, the advisors who can be subject to compliance. I think I heard my friend agree that it is enforceable by contempt. I think that is an injunction by any terms. The second thing I want to talk about is this idea about a data breach and the concern that purportedly being addressed here. There is simply nothing in the record, as I just said, that suggests that there's any risk of a security breach, a data breach here. This information has been in the advisor's possession for at least, under the allegations, for four to seven years. There's been no indication that there has been a data breach. Many of these are current clients of LPL's advisors. They are seeking their financial advice. They trust them to follow the security protocols that LPL has in place and imposes on its advisors to keep that information secure. And, indeed, in April of 2024, there was a notice, a notice of data breach. We didn't agree with that notice, but it was sent to the advisors to let them know what was going on. We haven't heard a peep from any of those advisors. I think that's very relevant to the third-party standing arguments. But it's also relevant to the fact that there's just no indication here that there's any risk of an actual data breach. These individuals, these clients, want their financial advisors to have their information in their possession to be able to provide them with financial advice. And the last thing I'll say, Your Honors, and I'm happy to address any questions, is that your question is Judge Clifton. We are not asking the court to stay and to move the interpretation of the stipulated order to the arbitration panel. We have asked the court, and it's part of our arguments, about the difference in scope. But I want to be clear, we would not object to that if that's where the court lands. We are perfectly happy to be before the arbitration panel. We think that's where this case belongs. And contrary to my friend's view, Rule 13804 expressly provides for arbitration panels, vendor arbitration panels, to issue permanent injunctive relief. If that's what's warranted, the panel can do that. All right. Thank you. All right. Thank you, Counsel. Thank you. Mr. Brannon? Thank you, Your Honor. A few quick points, Your Honor, and I'm happy to answer any questions you may have. LPL's counsel said he was going to be addressing the purported timeliness problem for us and the purported prejudice they suffered. Didn't get to it. There's nothing to suggest that our motion was untimely. And he certainly hasn't added to anything in the record, and there's nothing on it, about prejudice to them. He mentioned the March 14 memo. That, under your analysis, your typical analysis, like in the Calvers decision, I know two of you were on the Calvers panel, the crucial date for determining timeliness is the date when the interveners, putative interveners, have reason to believe that their interests might not be adequately protected by the other defendant in the case. At the earliest point in time, that was that March 14 memo, and that's when we got word that the stipulated order could go far beyond the bulk upload tool, and we filed within five weeks after that. Where's the prejudice? There is none. So that would be the first point, Your Honors. Another point is, Mr. Ellis actually already made it, 13-804 does provide for injunctive relief, contrary to what AmeriPaz's counsel said. Additionally, there is no evidence of us acting in concert in any way to undermine what the district court has done here. So if you have any questions about that, I'm glad to address them, but there's no evidence on that point and no basis for arguing that, actually. The critical thing here is if you conclude that we are entitled to intervene because our motion was timely and we had protectable interests at stake, then what happens after that? There are really only two things the district court could do, and that is consider the question of is a valid arbitration agreement in place and does it apply to AmeriPaz's demand regarding the forensic review. If the answer to both of those is yes and I submit to you that no reasonable person could reach any other conclusion, if the answer is yes, then the district court has no discretion. It must stay the proceedings pending arbitration. LPL agrees with us that that would be an appropriate result here. We contend it would be the only appropriate result here. That's the only way to protect our interests. Opposing counsel was suggesting that there's a related issue here, that we were what technically would be called the control person of AmeriPaz. It's the controlling person. We're the control person. Employer, employee. That would be the analogy. That they could somehow bind us to the stipulated order. That is not the case, and if you have any doubts about that, I would encourage you to look specifically at two things. One is FINRA Rule 13200, 13,200, and FINRA Regulatory Notice 16-25. Taken together, these two make clear that no member firm, neither LPL nor AmeriPaz, may compel an associated person, the financial advisors, no member firm may compel an associated person to waive his or her right to arbitration, and that's what would happen here if we were somehow bound by the stipulated order or bound by the July 18 order. We would effectively be waiving our right to arbitrate the propriety, nature, and scope of any forensic review. We don't waive that right. We've made it very clear we don't waive that right, and it's not just that that would be a violation of our right to arbitrate, but Regulatory Notice 16-25 makes it clear that if LPL attempted to do that to us or if, in this case, AmeriPaz is attempting to do us, that, in fact, is a violation of a separate FINRA rule, 2010. Regulatory Notice 16-25 makes it perfectly clear that AmeriPaz may not directly or indirectly compel us to waive our right to arbitration, which it is seeking to do here by saying that we are bound by the stipulated order, that we're bound by the July 18 order. With that, I'll rest unless you have any questions for me. All right, thank you very much. Thanks to all counsel for their briefing and argument in this case. I apologize for those from out of town. The weather in Southern California did not cooperate. It's supposed to get bad again later today. And with that, this case is submitted, and this particular panel is done. So good luck the rest of the week. Thank you. We're adjourned. Thank you. All rise. This court for this session stands adjourned.
judges: CLIFTON, OWENS, ALBA